Lewis A. WRIGHT, et.al.

v.

Donald S. NIMMONS, Trustee.

Civ. A. No. H–83–6906.

United States District Court,
S.D. Texas,
Houston Division.

Aug. 18, 1986.

Roger B. Greenberg and Jane Cooper-Hill, Richie & Greenberg, Houston, Tex., for plaintiffs.

William T. Green, III and Mark Alexander, Green, Downey, Patterson & Schultz, Houston, Tex., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CARL O. BUE, Jr., District Judge.

### I. *Introduction*

This is an action for equitable relief and statutory damages arising under the Employee Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. § 1001 *et seq.* Following the acquisition of four related closely-held corporations by Defendant, Donald S. Nimmons ("Nimmons"), the Plaintiffs, who are former shareholders, officers, and directors of the corporations, and participants and beneficiaries of the corporations' defined benefit pension plan, commenced suit against Defendant alleging breaches of fiduciary duty and seeking to protect their rights under ERISA. In his capacity as Trustee of the plan, Defendant has filed counterclaims seeking damages for violation of ERISA's prohibited transactions provisions which occurred prior to the change in corporate ownership. The controversy between the parties concerns the validity of two competing pension plans. Specifically, the proponents of the competing plans claim entitlement to the residual assets which are to be distributed as a consequence of the corporations' cessation of business.

This case came on for trial before the Court sitting without a jury. Having heard all of the testimony and reviewed the documentary evidence, this Court concludes that Plaintiffs are entitled to recover statutory damages, and to obtain equitable relief as a consequence of Defendant's breach of his fiduciary duty, and hereby enters its Findings of Fact and Conclusions of Law consistent therewith.

### II. *Findings of Fact*

A. *The Formation of the Pension and Profit Sharing Plans*

1. In 1971, Lewis Alvin Wright ("L.A. Wright") and Shelley V. Pate ("S.V. Pate") formed W.P. Constructors, Inc. ("W.P."), a construction company that specialized in the construction of underground water and sewage systems. For many years prior to the formation of the corporation, the business was operated as a partnership. The corporation was formed upon the advice of Nimmons who served as an accountant and financial consultant to the partnership.

2. The principals also incorporated three related companies: Pate Construction Company, Inc. ("Pate Co."), Aldine Construction Company, Inc. ("Aldine") and W.P. Leasing Corporation, Inc. ("Leasing"). Both Pate Co. and Aldine provided contract labor to W.P., while Leasing provided heavy equipment.

3. At about the same time that the businesses were incorporated, Nimmons advised L.A. Wright and S.V. Pate to establish pension and profit sharing plans for the employees of the corporations. Nimmons acted as agent in dealing with the attorney who prepared the initial pension plan for W.P., and the profit sharing plans for Pate Co. and Aldine. On Nimmons' recommendation, the corporations adopted the respective plans in 1971.

4. The original trustees were S.V. Pate and L.A. Wright. The original plan administrative committee consisted of Wright, Pate, and Clarice Cantrell ("C. Cantrell"). None of these individuals had experience, expertise, or knowledge concerning the administration of pension or profit sharing plans. Thus, they relied in all respects on Nimmons, who held himself out as a knowledgeable pension plan advisor.

5. W.P. was a closely-held corporation and essentially a family business. Consequently, the pension plan beneficiaries are primarily family members. However, the instant cause of action was also brought on behalf of the beneficiaries of the profit sharing plan, former employees of Pate Co. and Aldine, who comprised the labor force for the work performed by W.P.

B. *Administration of the Original Pension and Profit Sharing Plans*

6. Although the employer, W.P., assumed certain administrative duties for the plan, Nimmons was consulted regularly regarding plan administration. Nimmons' duties on behalf of the plans included the following: (1) keeping the books; (2) compiling employee data; (3) calculating em-

ployer contributions; (4) preparing required governmental reports and financial statements, and (5) preparing annual reports.

7. In addition to these specific tasks, Nimmons had an informal relationship of longstanding with the principals of the corporations. Due to this informal relationship of trust, Nimmons was provided with keys to the corporate offices so that he would have immediate access to the corporate books and records, including the books of the plans.

8. Nimmons rendered investment advice to the corporations, and served as a paid consultant from 1971 until 1981. The corporate principals, who were also trustees of the pension and profit sharing plans, relied extensively upon Nimmons' expertise and advice regarding the administration of the plans.

C. *The Original Pension and Profit Sharing Plans' Loss of Qualified Tax Status*

9. Nimmons served as the enrolled agent for the pension and profit sharing plans. In this capacity, he was empowered to appear before the Internal Revenue Service ("IRS") on behalf of the plans.

10. The passage of ERISA in 1974 imposed new requirements on employee benefits plans. Plans which did not meet the new requirements were threatened with severe consequences. Contributions made to a plan which loses its qualified status are not tax deductible by the corporation, and are taxable as ordinary income to the beneficiaries.

11. As the enrolled agent for the plans, Nimmons was charged with the duty of cooperating with the IRS on matters of plan qualification. By 1978, the IRS had still not received indication that the plans had been restated to comply with ERISA. Pursuant to an inquiry in December of 1978, Nimmons informed the IRS that the plans had been amended to comply with ERISA, and that an application for a determination letter would be forthcoming. However, the application for determination and amended plans were not sent. In August of 1979, the IRS conducted an investigation of the 1977 and 1978 annual returns. During that investigation, Nimmons provided the IRS with a prototype plan, but the plan had not been executed by the corporate officers or trustees.

12. Despite requests by the IRS for executed copies of a plan conforming to ERISA, and for a copy of the application for determination that had allegedly been filed, these were never received. Finding that the original plan documents were the operative plans, the IRS proceeded to review those plans for compliance with ERISA, but many deficiencies were noted.

13. A request by the IRS for corrective amendments and data sufficient to entitle the plans to ENCEP relief was made on August 20, 1981, but no response was received. The ENCEP program was designed to permit the IRS to qualify a plan retroactively if the plan had been administered in accordance with ERISA, even if plan documents in existence during the period did not conform with ERISA requirements.

14. In an attempt to comply with the requirements of ERISA so that the plans could retain their qualified status, Nimmons hired Hand and Associates in the Spring of 1980 to prepare "Schedule B's" for the plan years ending on May 31, 1977, 1978, and 1979.

15. A "Schedule B" is a computation of actuarial liabilities which must be signed by an enrolled actuary and filed each year with the plan's annual reports. For several years, Nimmons filed annual reports (Form 5500–C) without attaching the required "Schedule B's."

16. Margaret Young, an enrolled actuary employed by Hand and Associates, prepared "Schedule B's" for the years 1977–79. She also requested current information so that she could prepare the "Schedule B" for the plan year ending May 31, 1980. Although Nimmons promised to provide the information, he never sent it to Young. Instead, he once again prepared Form 5500–C without a "Schedule B," erroneously indicating on the form that a "Schedule B" was not required.

17. Throughout the years of investigation, the IRS dealt exclusively with Nimmons on behalf of the plans. Having determined that the original plan documents failed to comply with ERISA, and based upon the lack of response to repeated requests for conforming documents, the IRS assumed that the taxpayer did not desire to comply with ERISA requirements. Consequently, a final revocation letter was sent by the IRS on December 3, 1981, which resulted in the loss of the plans' qualified status.

18. Nimmons did not advise the trustees and plan administrators concerning the repeated requests by the IRS for amendments, even though they were not aware of ERISA or its requirements, and depended exclusively upon him for compliance with governmental regulations.

19. As a consequence of Nimmons' misfeasance, the qualified status of the plans was revoked, and the corporation and participants have incurred tax liability for the years that the plans were unqualified.

D. *The Stark and Frahm Plan*

20. Upon receipt of the final revocation letter from the IRS, dated December 3, 1981, L. Anthony Wright ("A. Wright") called Nimmons to question him about its significance. Nimmons assured him that there was no cause for alarm.

21. Upon the advice of their bonding agent, Roy Simmons, in February of 1982, however, the corporate directors retained the law firm of Stark and Frahm to counsel them with respect to Nimmons' failure to maintain the qualified status of the plan.

22. In February of 1982, A. Wright, then vice-president of the corporations, and Steve Pate ("S. Pate"), secretary/treasurer of the corporations, met with a representative of Stark and Frahm at Simmons' office. They explained the corporate structure and history of the plans, as they understood them, and requested Stark and Frahm to resolve their problems with the IRS.

23. In February of 1982, A. Wright, on behalf of the corporations, executed a power of attorney which authorized Stark and Frahm to draft and execute plan amendments that could be approved by the IRS. Stark and Frahm prepared a plan as directed, and diligently attempted to correct the problems resulting from the revocation letters.

24. On May 27, 1982, the Board of Directors of W.P. adopted by resolution the Third Amendment to The W.P. Pension Plan, renamed The W.P. Constructors, Inc. Defined Benefit Investment Fund Pension Plan (the Stark and Frahm Plan). Also on May 27, 1982, the pension plan amendment with trust agreement was executed on behalf of W.P. by A. Wright. The execution of the plan was attested to by S. Pate, corporate secretary. The executed instrument was acknowledged and delivered to A. Wright and S. Pate, who signed the instrument as the newly appointed trustees of the plan. A copy of the instrument was also delivered to Nimmons. Due to the continued negotiations for acquisition of the corporations, the principals of W.P. kept Nimmons informed regarding activities pertaining to the plans.

25. The Stark and Frahm pension plan follows a form typically used for closely-held corporations. With respect to excess assets, the plan specifically directs a pro-rata distribution among plan participants upon termination of the plan.[1]

---

1. The termination provision of the Stark and Frahm plan, Section 13.3, provides as follows:

In the event the plan is terminated for any reason, the vesting provisions contained herein shall be inapplicable and each member's accrued benefit shall become 100% vested. As of the date of termination, the present value of the accrued benefits of all members shall be adjusted to equal the net worth of the investment fund.... In the event the plan is terminated and the provisions of paragraph 13.4, which limit the benefit available to a member, cause the plan investment fund to exceed the sum of such member's unrestricted benefit plus the present value of the accrued benefits of all other members, the amount of such excess shall be used to increase each member's benefit, including the benefit of a restricted member, by allocating a portion of such excess to each member in the ratio that the present value of each such member's accrued benefit bears to the total present value

26. The Stark and Frahm plan provides for payment of benefits following a participant's termination of employment (Section 6.1(a)(3)), and for the lump sum payment of benefits (Section 6.2(b)(1)).

27. The Stark and Frahm plan also provides for the members and beneficiaries to receive a summary annual report, other information as required by ERISA, and an annual statement of benefits (Section 3.3).

28. In the Fall of 1982, Nimmons finally reviewed the Stark and Frahm plan. Since the amendment executed in May of 1982 had never been returned to Stark and Frahm for filing with the IRS, the law firm once again prepared and sent new corporate resolutions and blank signature pages for execution. After Nimmons received these blank documents for review, he noted that they did not accurately reflect his choice of trustees, and he requested that new documents be prepared in accordance with his wishes. Nimmons did not note any problems, however, with the previously executed documents. Nimmons did request Stark and Frahm to destroy the incorrect documents. However, rather than waiting for new documents to be prepared which accurately reflected his choice of trustees, Nimmons, on December 8, 1982, instructed Stark and Frahm to submit the plan, as executed by A. Wright on May 27, 1982, to the IRS for requalification. Pursuant to Nimmons' instructions, Stark and Frahm submitted their plan with an application for determination to the IRS, and notified Nimmons of the submission. (Testimony of Nimmons; S. Pate; Donald Stark; Robert Frahm; Plaintiffs' Exhibit Nos. 12, 15, 16, 17, 18, 38, 39; Defendant's Exhibit Nos. 16, 19, 20, 21, 22, 29, 30 31).

29. On April 14, 1983, Nimmons attempted to remove S. Pate and A. Wright as plan administrators, and S. Pate as trustee, to appoint himself as sole administrator, and to appoint S. Pate, A. Wright, Neil Cantrell, and himself as trustees. However, a trust instrument was not signed by these "trustees" at that time. Nimmons' actions were not properly taken under the Stark and Frahm plan, and on the advice of counsel, he repeated this procedure in January of 1984. On April 14, 1983, Nimmons also attempted to amend the excess asset distribution provisions of the Stark and Frahm plan, and a provision relating to the effect of the company's dissolution or insolvency.

30. On May 31, 1983, Nimmons again attempted to amend the Stark and Frahm plan, but failed to replace it with a properly executed trust instrument.

E. *The Hutcheson and Grundy Plan*

31. In April of 1983, Nimmons executed a power of attorney in favor of the law firm of Hutcheson and Grundy, and instructed them to withdraw the Stark and Frahm plan from IRS consideration. As a result, the IRS notified W.P. that it would give no further consideration to the Stark and Frahm plan. Consequently, the plan retained its unqualified status, and continued to incur the attendant tax liabilities.

32. In May of 1983, Hutcheson and Grundy prepared a plan which permitted the corporation to recapture excess assets. In the interest of getting a plan qualified with the IRS, S. Pate, N. Cantrell, and A. Wright agreed to sign the plan as trustees as long as Nimmons would sign a reserva-

---

of all member's accrued benefits. In allocating such excess, the present value of a restricted Member's Accrued Benefit shall be the full present value of his Accrued Benefit without regard to the limitation set forth in Paragraph 13.4. The Plan Administrator shall notify the Internal Revenue Service of such termination for a determination of the effect such termination shall have on the qualification of the Plan and the tax exempt status of the Trust, and shall make no distributions until such determination has been received. Unless the Company is a professional service company having 25 or fewer Members of the Plan, the Plan Administrator shall also notify the Pension Benefit Guaranty Corporation and shall make no distributions until receipt of Notice of Sufficiency from the Pension Benefit Guaranty Corporation. Upon receipt of a favorable determination letter from the Internal Revenue and Notice of Sufficiency from the Pension Benefit Guaranty Corporation, the Plan Administrator shall make settlement of the Members' Accrued Benefits in the accordance with Article VI.

tion of rights agreement acknowledging their claim to the excess assets. Nimmons agreed to this arrangement upon the advice of counsel, but subsequently refused to sign the agreement. As a result, the plan was not submitted to the IRS and remained unqualified.

33. Nimmons took no further action with respect to requalification until after Plaintiffs filed the instant lawsuit. Following Nimmons' refusal to sign the reservation of rights agreement in July of 1983, an amended plan (Hutcheson and Grundy II) was not executed until May of 1984.

34. The Hutcheson and Grundy II plan was submitted to the IRS with an application for determination which erroneously informed the IRS that the proposed plan was not the subject of litigation. The IRS noted that the plan was deficient in some respects. After corrective amendments, however, the Hutcheson and Grundy II plan was qualified in May of 1985, but only as far back as 1983.

35. Defendant's counsel reached the conclusion that the Stark and Frahm plan had been executed without authority and "back-dated" premised upon explanations and documentation provided by Defendant. However, Nimmons' assertion that concern for governmental regulation and potential liability motivated the withdrawal of the Stark and Frahm plan is inconsistent with his well documented prior conduct with respect to the plans. Accordingly, this Court finds that the "back-dating" theory advanced by Nimmons was fashioned in a last-ditch effort to seize control of excess assets upon termination of the plan.

### F. *Funding the Pension and Profit Sharing Plans*

36. In the early 1970's, S.V. Pate inquired into the purchase of a tract of land in Leon and Robertson Counties. Acting upon the advice of Nimmons, the principals of W.P. caused the pension plan, rather than the individuals or the corporation, to purchase the land. Subsequently, the land was platted and recorded as Lake Limestone Coves, a development adjacent to and bordering Lake Limestone. In 1978 and 1979, W.P. gratuitously improved the property by clearing, grading, and constructing roads and culverts. As a result of these improvements and the property's proximity to Lake Limestone, the value of the property appreciated considerably.

37. As a consequence of appreciation in value of the plan's primary asset, the W.P. pension plan became "over-funded." An over-funded plan is one in which plan assets exceed the plan's obligation to pay vested benefits. Since employer contributions were unnecessary as a result of over-funding, there have been no contributions to the pension plan subsequent to Nimmons' acquisition of the corporations.

38. Nimmons, who is intimately familiar with the corporate books and records, was aware of the appreciation of the property. He estimated the increasing value of the property on the Form 5500–C's prepared for filing with the IRS each year.

39. Nimmons understood and appreciated the difference between plan assets and actuarial liabilities. In other words, he knew the significance of an over-funded plan. The principals of the corporation and plan participants, on the other hand, did not understand this significance. Although they knew that there were sufficient assets to make additional employer contributions unnecessary, they believed that all of the assets in the plan belonged to the participants and beneficiaries.

40. The excess plan assets accumulated as a result of the efforts of the former principals of the corporation. Since the corporations were family operated, everyone assumed that assets would accumulate solely for the benefit of the plan participants, and that no conflicting claims would ever be asserted by the corporation.

### G. *The Change of Corporate Ownership*

41. In August or September of 1981, Nimmons expressed an interest in acquiring W.P. and the related corporations. At that time, the corporations were owned by S.V. Pate and A. Wright, who negotiated the sale of the companies. The negotiations continued into 1982. An agreement

was reached, and closing was set for April 15, 1982. The closing was postponed several times and was finally accomplished on July 22, 1982. The purchase terms provided that Nimmons, through his holding company, was to pay Five Hundred Thousand Dollars ($500,000.00) in cash to both S.V. Pate and A. Wright, was to give a $500,-000.00 promissory note to A. Wright, and to place $500,000.00 into a certificate of deposit for S.V. Pate, payable in one year. The only money that has been paid is the initial $500,000.00 in cash to each owner. Wright's note and Pate's certificate of deposit have not been paid.

42. The purchase price of the corporations was negotiated after determining the book value of corporate assets, including equipment, real property, receivables, and pending contracts. There was no discussion concerning the plans prior to the sale. The parties did not treat the pension plan as a corporate asset, and the value of excess assets in the plans was not a factor in determining the purchase price of the corporations.

43. No consideration was paid to the principals for the excess assets in the pension plans. S.V. Pate and A. Wright would not have sold the corporations to Nimmons had they known that he would attempt to recapture any of the plan's assets.

44. The corporations had a longstanding attorney-client relationship with a relative of Defendant. Thus, W.P.'s counsel withdrew from legal representation prior to the closing date to avoid a conflict of interests. With full knowledge that the principals were unrepresented by counsel at the time of the closing, Nimmons failed to disclose the information that he had gleaned from many years as a paid plan consultant—that the pension plan was over-funded, and that the sponsoring employer might recapture excess plan assets in certain circumstances.

45. Since all aspects of plan administration had been essentially delegated to Nimmons, the principals did not understand ERISA requirements. As a consequence of this lack of understanding, S.V. Pate executed an agreement at the closing which allowed him to continue acting in a trustee capacity, upon the misunderstanding that he would thereby be able to exert control over plan assets. Moreover, Nimmons was fully aware of the principal's lack of knowledge and dependence upon him regarding matters pertinent to the pension plan, and he was equally aware of S.V. Pate's mistaken impression when signing the trustee agreement at the time of closing.

46. By March of 1983, Nimmons was experiencing severe cash flow problems, and looked to the pension plan as a ready source of cash. He intended to terminate the plans and recapture excess assets to pay the debts of his corporations.

H. *Administration of the Plans Subsequent to the Change In Corporate Ownership*

47. Following Nimmons' acquisition of the corporations, the trustees of the W.P. plan were supposed to be: Nimmons, A. Wright, S.V. Pate, and N. Cantrell. However, Nimmons, as sole shareholder after his acquisition, failed to adopt a resolution effectuating an agreement with S.V. Pate and Neil Cantrell that they could serve as trustees. Accordingly, on July 22, 1982, the trustees were still S. Pate and A. Wright, who had been appointed on May 27, 1982.

48. Although he had not been officially appointed as trustee or administrator, Nimmons assumed exclusive control of the W.P. plan after his acquisition of the corporation. He opened trust bank accounts on his own signature, made unilateral investment decisions, and prevented the trustees or plan administrators from asserting any control over trust matters.

49. On January 20, 1984, Nimmons removed S.V. Pate, N. Cantrell, and A. Wright as trustees of the plans, and purported to appoint his wife and other family members to trustee positions. However, on March 2, 1984, Nimmons removed all trustees except himself, and at the time of trial purported to be the sole administrator and sole trustee of the plans.

50. During negotiations with InterFirst Bank Houston, N.A. ("InterFirst"), to obtain financing for his acquisition of the subject corporations, Nimmons indicated that the plan's cash assets would be moved to InterFirst if InterFirst financed the acquisition. After the acquisition, Nimmons, in fact, did move the cash deposits to InterFirst.

51. Although service upon Defendant in the instant case was accomplished by mail pursuant to Fed.R.Civ.P. 4, Nimmons did not answer within twenty (20) days. Instead, on December 19, 1983, Nimmons met with officers of InterFirst, and executed a deed of trust in favor of the bank covering the plans' Lake Limestone Coves property. Thereafter, Nimmons was served by personal service on December 22, 1983.

52. On June 28, 1983, Nimmons executed a security agreement in favor of InterFirst, which granted a security interest in all of the pension plan assets that might ultimately be recaptured by the corporate sponsor. The security agreement was given to secure the payment of corporate debt personally guaranteed by Nimmons.

53. During the years that the plans were administered by W.P., the corporate sponsor paid all plan expenses and provided requisite services gratuitously. However, Nimmons has charged the plan a "trustee's fee" of Eighty Dollars ($80.00) per hour during the pendency of the instant lawsuit. This charge has been for menial and clerical tasks, such as driving to the bank to make deposits, driving to the post office to pick up mail, and posting in ledger books. Moreover, Nimmons has charged the plan an Eighty Dollar ($80.00) per hour fee for time spent in efforts to resolve the problems created by his own negligence. For example, Nimmons has charged the same "trustee's fee" for time spent meeting with his attorneys to defend the instant lawsuit, and for time spent with the representatives of InterFirst in an attempt to resolve the problems caused by his execution of the deed of trust on plan property in December of 1983. The total "trustee's fees" charged to the plans between April of 1983 and February of 1985, when this Court's order prevented further payments, were approximately Ninety-Nine Thousand Dollars ($99,000.00).

54. The plan assets consist primarily of cash deposits totalling in excess of Eight Hundred Thousand Dollars ($800,000.00). In addition, the plan owns residential lots at Lake Limestone Coves. In connection with approximately fifty (50) monthly payments on contracts for deeds, it is necessary to compile deposit slips, post receipts of payments, and deposit payments in a trust account. The remaining unsold lots require little attention other than marketing efforts.

55. In 1981, Nimmons signed a contract for deed for two (2) lots at Lake Limestone Coves. Although obligated to make annual payments to the pension plan for these lots, Nimmons has failed to make any payments since he acquired the companies.

56. The record reveals that the pension and profit sharing plans could be administered efficiently for less than Ten Thousand Dollars ($10,000.00) per year. Even if an institutional trustee had been appointed, a reasonably anticipated charge would be less than Fifteen Thousand Dollars ($15,000.00) per year.

57. Since Nimmons' acquisition of the corporations, "administrative expenses" have exceeded Forty Thousand Dollars ($40,000.00) per year. Nevertheless, Nimmons has failed to prepare or file with appropriate government agencies the forms, reports, and returns required to be filed. Specifically, he has failed to prepare and file annual reports (Form 5500–C) and Schedule B's. He did not request, nor did he obtain, an extension of time in which to file such returns. Moreover, the failure to file timely returns and reports subjects the plan to potential penalties, and prevents both the government and plan participants from obtaining an accounting of trust assets. Notice to the Pension Benefit Guaranty Corporation ("PBGC") and to the IRS was not given when all of W.P.'s employees were terminated. Notwithstanding the generous fees charged, annual statements of benefits were not prepared and provided

to participants until after an injunction was obtained from this Court.

## I. *The Payment of Benefits to Plan Beneficiaries*

58. The original plan permitted participants to elect optional forms of payment of benefits at retirement, including lump sum payments, provided the option was acceptable to the administrative committee. Since the company was closely held by family members, it was generally understood that each participant's election would be respected.

59. In 1979, for example, the committee approved the election of C. Cantrell to take the lump sum actuarial equivalent of her vested benefit upon departure from the company. Nimmons requested Hand and Associates to calculate the benefits due to C. Cantrell. Although Young advised Nimmons that C. Cantrell's lump sum present value benefit was approximately Ten Thousand Dollars ($10,000.00), and that the reserve necessary for the benefit was nearly Fifty Thousand Dollars ($50,000.00), Nimmons erroneously advised the plan trustees to pay C. Cantrell a lump sum benefit of Forty-Seven Thousand Dollars ($47,000.00).

60. At the time of his retirement from the company in 1975, L.A. Wright sold his stock in equal shares to N. Cantrell, his son-in-law, and to A. Wright, his son. However, L.A. Wright elected to defer receipt of his benefits until his normal retirement age of sixty-five, which occurred in February of 1983.

61. In April of 1983, L.A. Wright requested payment of his lump sum benefits. Nimmons made no response in writing to Wright's request until June 29, 1984. Despite the fact that Hand and Associates had calculated Wright's benefits in 1980, and Nimmons therefore knew that Wright was entitled to the payment of benefits in February of 1983, he requested another actuary to recalculate the benefits. The actuary, William H. Mercer-Meidinger, was not contacted to perform an actuarial valuation until May of 1984, and Nimmons did not provide sufficient employee census information to permit the calculation of vested benefits until July of 1984.

62. Although ordered to pay Wright's benefits on August 22, 1984, Nimmons did not pay the benefits until this Court once again ordered the payment on September 24, 1984, pursuant to a hearing on Plaintiff's show cause motion. When the benefits were finally paid to Wright, the calculations prepared by Hand and Associates in 1980 were used, since Nimmons had discovered that the Meidinger analysis would result in a larger settlement.

63. The employees of Pate Co. and Aldine were terminated in April of 1983. However, they were not offered an election to receive benefits until an agreed injunction was entered on August 22, 1984. Moreover, when benefit checks were finally sent to participants, they contained a "conditional release" of the participants' claims against Nimmons.

64. In addition to refusing to pay benefits that were clearly due, Nimmons has also paid benefits to employees who were not entitled to receive benefits in August of 1984 because they had not been employed by the corporations long enough to have a vested interest. In fact, some of the employees paid by Nimmons had been employed for less than two weeks.

65. On March 12, 1984, the plan participants made written requests for copies of the latest summary plan description, the annual report, and a statement of vested benefits. The participants did not receive a statement of their benefits until August of 1984, after they had filed an application for a preliminary injunction and an agreed injunction had been entered requiring Nimmons to provide the requested information. The requested summary plan description was not provided until July of 1984. The requested annual report has never been provided.

66. Finally, employee benefits have been calculated under the Hutcheson and Grundy plan, which was not in existence at the time that the employees were terminated. The amended plan, Hutcheson and Grundy II, purports to make changes

which adversely affect the rights of the participants. For example, the amended plan does not specify various optional forms of payment, such as lump sum payments, which had been specifically available under prior plans. Thus, the amended plan purports to make forms of payment discretionary which had been expressly available under the plans in effect at the time the employees were terminated. Although Nimmons made a trial offer to pay lump sum benefits, his refusal to pay benefits until the time of trial was apparently motivated by malice rather than a good faith exercise of discretion.

67. By early April of 1983, all jobs had been abandoned, all field workers terminated, and no work was being performed by W.P. Although employees were paid wages through April 15, 1983, all employees of W.P. had been terminated prior to that date. Moreover, W.P. has not conducted business or hired employees since April of 1983. There are no beneficiaries of the pension plan, other than Plaintiffs, whose rights should be determined with reference to the Stark and Frahm plan. There is no indication that W.P. will ever resume business operations, employ personnel or make contributions to the pension plan since the corporations are insolvent.

68. As a direct consequence of Defendant's conduct, Plaintiffs have incurred substantial legal expenses. A reasonable award of attorney's fees to Plaintiffs for having to file this lawsuit to pursue their rights as ERISA participants is Two Hundred Forty Thousand Dollars ($240,000.00).

J. *The Counterclaims Asserted by Nimmons*

69. Until counterclaims were asserted by Nimmons in the case at bar, no claim has ever been asserted or intended to be asserted against the plan on behalf of the corporations for the gratuitous improvements of the plan's real property at Lake Limestone Coves.

70. To prevent contamination of water wells by septic tanks, regulations promulgated by the Brazos River Authority require water wells on the plan's property to be located at a distance of at least three hundred (300) feet from the nearest residential lot. Thus, to ensure that construction did not occur near the water well serving the plan's development, the lots on which the water well was situated were conveyed to Lakemont Construction Company in December of 1982. These lots, which were conveyed by A. Wright and S. Pate, acting in their capacity as trustees, were not capable of being sold by the plan because no septic system could be installed on them. Moreover, Nimmons, who was the owner of W.P. at that time, directed S. Pate and A. Wright to make the conveyance.

71. Lakemont Construction Company, which is owned by S.V. Pate, constructed the water system that services Lake Limestone Coves at no cost to the plan because Nimmons had advised the trustees that the plan could not operate a utility. Lakemont continued to operate the water system that services the development without charging the plan, and thereby enhanced the value of the pension plan's primary asset.

72. S. Pate purchased four (4) lots at Lake Limestone Coves upon the advice of Nimmons that there was no prohibition against the purchase of plan property by corporate officers. After becoming a trustee, in July of 1982, Pate attempted to sell his lots. However, the plan's attorney prepared closing documents that showed the plan rather than Pate as the seller. In order to correct the resulting title problems, the attorney recommended that Pate assign his lots to the plan. Nimmons concurred in this advice. While the documents reflect an assignment to the plan for a cash sales price, the transaction was in reality an attempt to cure problems created by the incorrect preparation of documents. Nimmons did not advise Pate that the transaction might be prohibited by ERISA or that an exemption should be sought. Thus, Pate relied upon the advice of his attorney and on Nimmons in completing the transaction.

73. The counterclaims at issue in the instant case involve transactions which were entered into by the former principals of the corporation upon the advice of Nim-

mons. Accordingly, this Court finds that Defendant's counterclaims are without merit.

### III. *Conclusions of Law*

1. The participants and beneficiaries of the W.P. pension plan have commenced this action pursuant to 29 U.S.C. § 1132(a)(1)(B) to clarify their rights to benefits under the terms of the plan. A central issue in this case is whether the pension plan has been effectively amended to provide for the distribution of assets to the corporate sponsor after all liabilities to beneficiaries and participants have been satisfied. Specifically, this Court must determine who is the lawful claimant to approximately One Million Dollars ($1,000,000.00) of surplus assets in the plan. Although corporate sponsors are generally permitted to amend a plan to provide for the recapture of excess assets if certain conditions are met, the attempt to recapture excess assets upon the termination of a plan maintained by a close corporation raises issues of first impression under ERISA. In traversing uncharted territory, the source of the law to be applied to the facts in this case must be the underlying policies of the statutory scheme. This Court has jurisdiction of this cause of action pursuant to 29 U.S.C. § 1132(e), and 28 U.S.C. § 1331, and venue is proper in this district.

### A. *The ERISA Fiduciary: The Duty of Loyalty and the Duty of Due Care*

2. Courts have consistently characterized the duty of pension plan administrators and trustees as fiduciary in nature. *See, e.g., Donovan v. Mercer*, 747 F.2d 304 (5th Cir.1984). However, to state that a person is a fiduciary only begins the analysis; it gives direction to further inquiry. *SEC v. Chenery Corp.*, 318 U.S. 80, 85–86, 63 S.Ct. 454, 458–59, 87 L.Ed. 626 (1943). To whom, and what obligations do individuals owe as ERISA fiduciaries? What are the consequences of their failure to discharge fiduciary obligations?

3. The Fifth Circuit has established that the concept of fiduciary duty is to be broadly construed within the ERISA context. *See Donovan*, 747 F.2d at 308. Thus, as an individual with authority and responsibility with respect to plan matters, Nimmons must be characterized as an ERISA fiduciary since the inception of the original W.P. plans.

4. In general, the duty of loyalty and the duty of due care are subsumed in the concept of fiduciary duty. The duty of loyalty, on the one hand, is rooted in intentional tort law. Thus, this aspect of fiduciary duty is commonly expressed in the form of a prohibitive rule. In short, a fiduciary *must not* treat the trust *res* as if it were his own property; the fiduciary must not abuse his position of trust in order to advance his own selfish interests. On the other hand, the duty of due care is rooted in negligence principles, and is commonly expressed affirmatively. The fiduciary, therefore, must exercise at least that degree of care that a reasonably prudent person would devote to his own affairs under like circumstances. In short, a fiduciary *must* treat the trust *res* as if it were his own property; the fiduciary must exercise his position of trust so that the beneficiary of the trust is not harmed as a consequence of his failure to exercise reasonable care.

5. These two principles, theoretically, exist in conflict. In practice, however, it is ordinarily not difficult to discern the governing principle in a given set of circumstances. The facts of the instant case do not raise close questions. As an enrolled agent and paid consultant, Defendant repeatedly breached his duty of due care. Defendant has also blatantly disregarded his duty of loyalty by consistently treating the trust assets as if they were his own property subsequent to his acquisition of the corporations.

6. These two seminal principles, the duty of due care and the duty of loyalty, pervade the statutory scheme enacted by Congress in ERISA. *See, e.g.,* 29 U.S.C. § 1104(a)(1).[2] Consequently, an ERISA fi-

---

**2.** The prudent person standard imposed by ERISA provides that the fiduciary shall dis-

charge his duties with respect to the plan solely

duciary must discharge his duties with respect to a plan solely in the best interest of plan participants and beneficiaries, while meeting an objective standard of reasonable prudence.

█ 7. Defendant has willfully violated the prudent person standard imposed by Section 1104(a)(1) of ERISA. Defendant's grossly negligent conduct in failing to respond to IRS requests, and in failing to bring the plans into compliance with ERISA requirements directly caused the plans' loss of qualified status in December of 1981.

8. Following his acquisition of the corporations in 1982, Nimmons has directed the preparation of three (3) plans, yet failed to obtain qualification until 1985. Qualification of the Stark and Frahm plan would have minimized the damages caused by Nimmons' prior negligence. However, Defendant's withdrawal of the Stark and Frahm plan from IRS consideration, and his refusal to take action concerning requalification until after the commencement of this lawsuit, exacerbated the potential damages arising from disqualification and represents a blatant attempt to discredit a plan whose distribution provisions Defendant hoped to avoid.

9. Since Nimmons' acquisition of the corporations, the plans have not been administered for the exclusive purpose of providing benefits to participants and beneficiaries. The lengthy delay and refusal to pay benefits to L.A. Wright constitute a violation of § 1104(a)(1)(A) and (D). The fact that there was no dispute concerning Wright's entitlement to benefits underscores the malice that permeates Nimmons' conduct with respect to plan participants. Retaliatory motivation is simply impermissible under ERISA. *Jiminez v. Pioneer Diecasters*, 549 F.Supp. 677 (C.D.Cal.1982).

█ 10. The Stark and Frahm plan provides for participants to receive lump sum payments (§ 6.2(b)(1)), and for participants to be eligible for benefits upon termination of service with the company (§ 6.1(a)(3)) or at the end of the plan year in which a participant experiences a break in service (§ 6.1(f)). A fiduciary is obligated to administer the plans in accordance with the documents and instruments governing the plan, 29 U.S.C. § 1104(a)(1)(D), and may not amend the plan to impose different entitlement requirements after participants have brought suit to enforce their rights under the plan. Thus, Nimmons' continued refusal to pay undisputed vested benefits constitutes a breach of duty, and his offer to pay benefits under the Hutcheson and Grundy plan constitutes an additional breach since the participants' rights are to be determined by the plan in effect at the time of termination. The method of payment under the Stark and Frahm plan may be subject to amendment if it is in the best interest of plan participants. However, a trustee's exercise of discretion may not be motivated by self-interest, malice or retaliation. *See Frary v. Shorr Paper Products, Inc.*, 494 F.Supp. 565 (N.D.Ill.1980).

█ 11. Nimmons' failure to pay the trust for his lakefront lots is a manipulation of plan assets to his own benefit in violation of 29 U.S.C. § 1106(b)(1). Similarly, the transfer of plan assets to InterFirst in exchange for the bank's agreement to finance his acquisition of the companies violates ERISA standards. *Freund v. Marshall & Ilsley Bank*, 485 F.Supp. 629 (W.D.Wis.1979). Furthermore, execution

in the interest of the participants and beneficiaries and—

    (A) for the exclusive purpose of:
    (i) providing benefits to participants and their beneficiaries; and
    (ii) defraying reasonable expenses of administering the plan;
    (B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use

in the conduct of an enterprise of a like character and with like aims;
    (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
    (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter or subchapter III of this chapter.
29 U.S.C. § 1104(a)(1).

of the deed of trust in favor of InterFirst clouded title to trust assets, and is a conflict of interest transaction which is prohibited under Section 1106(b)(1).

■ 12. Nimmons' payment to himself of over Ninety-Nine Thousand Dollars ($99,000.00) in trustee's fees is impermissible under ERISA. While a reasonable trustee's fee may be paid to one who is not a full-time paid employee of the sponsoring company, 29 U.S.C. § 1108(c)(2), the payments in this case were excessive, unwarranted, and unrelated to any services rendered as a trustee. Defendant is not permitted to pay himself at an exorbitant rate for time spent correcting his past mistakes.

■ 13. In addition to the general obligations imposed by Section 1104, an ERISA fiduciary is subject to specific statutory obligations including reporting and disclosure requirements. Nimmons' failure to respond to requests for information and to prepare and file proper disclosure reports are further breaches of fiduciary duty. Defendant has willfully failed to comply with the requirements of 29 U.S.C. § 1021(a) and (b), and with the provisions of Section 1024(b)(3). By failing to respond to Plaintiffs' letters of March 12, 1984, Nimmons has also violated his obligation which arises under 29 U.S.C. § 1025.

■ 14. All counterclaims are dismissed. The transactions complained of by Nimmons are not prohibited in substance, caused no injury to the plan, and were conducted with Nimmons' full knowledge and upon his advice. The assertion that the plan owes over Nine Hundred Thousand Dollars ($900,000.00) to the corporations is invalid, and was made in an attempt to manipulate the plan's assets for Defendant's own purposes.

**B. *The Distribution Provisions of the Stark and Frahm Plan***

15. The initial pension plan adopted by W.P. provided that the employer could amend the plan by delivering a written instrument to the trustee after execution by the Board of Directors. Since the amendment became effective upon endorsement of the trustee's receipt (§ 6.1 of the original plan), the original plan was properly amended by the Stark and Frahm plan.

16. In detailed and explicit distribution provisions, the Stark and Frahm plan provides that if excess assets exist in the plan after vested benefits have been calculated, the excess assets must be apportioned pro rata and distributed to participants.[3] The irrevocable nature of this distribution provision is underscored by multiple references. Section 1.2 stresses that no portion of the trust shall ever revert to the company except as specifically provided. However, the plan provided for the entire trust to be distributed to participants upon termination. Furthermore, Section 7.9 stresses that the plan should never be construed to vest any rights in the corporation other than the rights which are expressly provided by the plan. In light of the elaborate distribution provisions for the benefit of participants, Section 7.9 limits the rights of the corporation to those specifically stated in the plan, notwithstanding any contary amendment provision. In sum, the distribution provisions of the Stark and Frahm plan are so explicit that the intent of the grantors may not be avoided by Nimmons' subsequent attempts to amend the operative plan to allow recapture of excess plan assets.

■ 17. Although Nimmons argues that his resolution of April 14, 1983, and the Hutcheson and Grundy II plan exe-

---

**3.** In addition to the termination provision, *see* note 1 *infra,* the Stark and Frahm plan provides as follows:

7.9 *No benefit to the company.* No part of the income or corpus of the Trust shall be used for any purpose except for the exclusive benefit of the employees and their beneficiaries and the expenses of administration of the plan. Anything to the contrary herein

notwithstanding, the plan shall never be construed to vest any rights in the company other than those specifically given hereunder.
Section 1.2 of the plan provides:
... the trust shall be for the exclusive benefit of the employees of the company and in no event shall any portion of the trust ever revert to the company except as specifically provided herein upon termination of the plan.

cuted in May of 1984 are amendments that would permit the corporation to recapture excess assets, this Court concludes that the amendments are not valid with respect to the distribution of excess assets. The Court notes that the Stark and Frahm plan permitted amendment only to the extent that no amendment shall:

(i) have the effect of vesting in the company any interest in any property held subject to the terms of this trust;

(ii) cause or permit any property held subject to the terms of this trust to be diverted to purposes other than the exclusive benefit of the present or future members and their beneficiaries ... [or]

(iii) reduce the beneficial interest of a member in any of the assets of the trust at the time of such amendment ...

Thus, this amendment provision includes more than the obligatory "exclusive benefit" language which has been construed to permit amendment allowing recapture of excess assets. The "exclusive benefit" requirement imposed by ERISA is met here by Subsection (ii) of § 13.1. Subsection (i) should not, therefore, be construed as a superfluous repetition of the exclusive benefit rule. Consequently, Nimmons' amendment permitting recapture of excess assets violates Subsection (i) of the Stark and Frahm amendment provision, and is void. *See Bryant v. International Fruit Products Co.*, 793 F.2d 118 (6th Cir.1986) (Reversing the district court's interpretation of 29 U.S.C. § 1344(d) premised upon similar language as is contained in § 13.1 of the Stark and Frahm plan, and holding that employer's amendment to recapture excess assets was impermissible).

18. Furthermore, the Stark and Frahm plan provides that the plan is to terminate as to any group of employees which is discharged as a group. Since all of W.P.'s employees were discharged prior to April 14, 1983, the date of Nimmons' purported amendment, the discharge of all employees resulted in a constructive termination of the entire plan. At *that time*, the participants were entitled to a distribution of excess plan assets in accordance with the distribution formula set forth in Section 13.3 of the Stark and Frahm plan.

19. The W.P. pension plan ceased to operate as a bona fide plan in April of 1983, and there has been no subsequent indication of corporate intent or capacity to resume operations. The circumstances involved in the instant case clearly support the conclusion that the plan has not been continued for the exclusive benefit of participants. Rather, the unnatural and abusive prolongation of the plan solely for the purpose of supporting the Defendant's attempted amendments to permit the recapture of plan assets violates the broad remedial protections afforded by ERISA. In sum, the plan's continued existence since April of 1983 has been a sham.

20. In any event, Nimmons' attempted revocation of the Stark and Frahm plan on May 31, 1983 must be considered an *actual* plan termination since a written plan had not been effectively executed to replace the revoked plan and trust.

21. The Stark and Frahm plan was adopted by the Board of Directors on May 27, 1982 to redress the problems resulting from the IRS disqualification. Accordingly, equity does not now permit Defendant to complain about the effect of distribution provisions which are consistent with the intention of the grantors, and which were ratified by Nimmons when he instructed Stark and Frahm to submit their plan for IRS consideration.

## C. The Recapture of Excess Plan Assets

22. Although this Court concludes that the contemplated amendments of the W.P. pension plan are barred by the operational plan itself, and that the plan's unnatural prolongation constitutes a violation of the spirit, if not the letter of Section 1106, which requires a fiduciary to guard the interests of the plan's participants, rather than those of the corporate sponsor, the statutory exception to the exclusive benefit rule will be examined as an alternative basis for the decision reached in this case. *See* 29 U.S.C. § 1344(d).

23. Corporate sponsors have the right to amend employee welfare plans to

provide for the recapture of excess plan assets *if* the plans can be amended consistently with the requirements imposed by ERISA. The statutory exception to the exclusive benefit rule provides that any residual assets of a defined benefit pension plan funded solely by employer contributions may be distributed to the employer upon plan termination provided that the following three conditions are met:

(A) all liabilities of the plan to participants and their beneficiaries have been satisfied,

(B) the distribution does not contravene any provision of law, and

(C) the plan provides for such a distribution in these circumstances.

29 U.S.C. § 1344(d)(1). *See Washington-Baltimore Newspaper Guild,* 555 F.Supp. at 259.

24. In construing Section 1344(d)(1), courts have generally permitted corporate sponsors to recapture excess assets through plan amendment providing that all benefits under the existing plans are not thereby reduced. *See, e.g., In re C.D. Moyer Company Trust Fund,* 441 F.Supp. 1128 (E.D.Pa.1977), *aff'd,* 582 F.2d 1273 (3rd Cir.1978); *Washington-Baltimore Newspaper Guild Local 35 v. Washington Star Company,* 555 F.Supp. 257 (D.D.C. 1983), *aff'd,* 729 F.2d 863 (D.C.Cir.1984); *Walsh v. Great Atlantic & Pacific Tea Company, Inc.,* 96 F.R.D. 632 (D.N.J.1983), *aff'd,* 726 F.2d 956 (3rd Cir.1983); *Pollock v. Castrovinci,* 476 F.Supp. 606 (S.D.N.Y. 1979), *aff'd,* 622 F.2d 575 (2d Cir.1980); *Audio Fidelity Corp. v. Pension Benefit Guaranty Corp.,* 624 F.2d 513 (4th Cir. 1980); *Eagar v. Savannah Foods & Industries, Inc.,* 605 F.Supp. 415 (N.D.Ala.1984); *Bryant v. International Fruit Products Company, Inc.,* 604 F.Supp. 890 (S.D.Ohio 1985).

25. While there is a minority position to the effect that the exclusive benefit language required by ERISA precludes the recapture of excess assets, *see, e.g., F.D. I.C. v. Marine Nat'l Exchange Bank of Milwaukee,* 500 F.Supp. 108 (E.D.Wis. 1980); *Calhoun v. Falstaff Brewing Corp.,* 478 F.Supp. 357 (E.D.Mo.1979), the better reasoned position is that the "exclusive benefit" rule *standing alone* does not preclude an amendment which specifically directs the distribution of excess assets to the corporation in appropriate circumstances.

26. A controlling factor in the cases which have permitted recapture has been the absence of an excess asset distribution provision in the plan sought to be amended. In other words, to the extent that ERISA provisions do not expressly preclude a contemplated distribution, judicial interpretation is bottomed upon the application of general contractual principles. Thus, courts which have permitted a recapture amendment have been influenced by the fact that the plans did not provide for the distribution of excess assets to participants. *Washington-Baltimore Newspaper,* 555 F.Supp. at 257; *Pollack v. Castrovinci,* 476 F.Supp. at 606; *In re C.D. Moyer Co. Trust Fund,* 441 F.Supp. at 1128.

27. A fundamental legislative purpose was to assure that plan participants "actually receive benefits and do not lose benefits as a result of unduly restrictive forfeiture provisions or failure of the pension plan to retain sufficient funds to meet its obligations." 1974 U.S. Code Cong. & Ad. News 4676–77. To these ends, Congressional intent is embodied in the "exclusive benefit rule" requiring that plan assets be held for the exclusive benefit of participants. *See* 29 U.S.C. § 1103(c)(1). At the same time, residual assets that have been exclusively contributed by an employer may be recovered in certain situations. *See* 29 U.S.C. § 1344(d)(1).

28. Judicial interpretation of the interaction of Sections 1103 and 1344 suggests that a recapture amendment should be permitted in two situations. First, where a trust plan is silent regarding the distribution of excess assets, courts must ascertain the probable intent of the plan originators premised upon a factual inquiry. If an employer has exclusively funded a plan, the courts reason, the unbargained for distribution of excess assets to participants represents an unintended

windfall for employees. Secondly, and more significantly, where excess assets have accumulated as a consequence of actuarial error, courts have been reluctant to penalize employers for overfunding their plans.

29. The judicial outcome permitting an employer to recapture in these two situations is consistent with the policies underlying the enactment of ERISA. Common sense dictates that employers which fund plans under ERISA guidelines should not be penalized for overfunding in an abundance of caution or as a result of miscalculation by the actuary. The contrary judicial outcome would contravene congressional purpose by creating a disincentive for employers to adequately fund employee welfare plans.

30. The policy considerations which underlie the permissible recapture of excess assets are conspicuously absent from the case at bar. In contrast to the courts which have permitted recapture, the Fourth Circuit in *Audio Fidelity Corp.*, 624 F.2d at 516–17 announced a rule that is more applicable to the present, analagous circumstances. The Fourth Circuit concluded that a recapture amendment is impermissible when a plan expressly provides for the distribution of excess assets to participants, particularly when an attempted amendment occurs subsequent to termination. Concluding that the right to benefits under a plan is earned, delayed compensation, and not gratuities, the Fourth Circuit rejected "Audio's claim that its employees would be unjustly enriched by receiving their equitable share of the fund's assets." *Id.* at 518, *quoting, Rochester Corp. v. Rochester*, 450 F.2d 118, 121 (4th Cir.1971). Reasoning that the plan fixed the rights of participants at the time of termination, the court held that the employer's post-termination attempt to divert surplus assets was prohibited by ERISA. Furthermore, an impermissible attempt to amend a distribution provision may itself constitute a breach of fiduciary duty. *See Delgrosso v. Spang & Co.*, 769 F.2d 928 (3d Cir.1985).

31. In contrast to the cases relied upon by Defendant, the relevant equitable factors in the present case overwhelmingly favor the plan participants and beneficiaries. Accordingly, this Court concludes that Defendant's purported amendment to permit recapture violates the express provisions and the spirit of ERISA, and would work a fraud upon the participants.

32. This Court concludes that the pension plan assets were not "sold" to Nimmons when he acquired the companies. *See Foster Medical Corp. Employee's Pension Plan v. Healthco, Inc.*, 753 F.2d 194 (1st Cir.1985). The excess assets were not subject to the bargaining and negotiation that led to the stock purchase agreement. The purchase price of the corporations was arrived at through an evaluation of equipment values, pending work, value of real property, and other traditional indices of a corporation's value. As a consequence of his superior knowledge and experience gained from serving as a paid plan consultant, Nimmons knew of the existence and the amount of excess plan assets. Yet, he failed to disclose his intention to control the excess plan assets through acquisition of the corporations. While the fiduciary relationship is consensual, and may be terminated at any time, there is a continuing obligation, under the circumstances involved in the instant case, to disclose material facts gained from years of experience as an ERISA fiduciary. To the extent that plan assets in excess of One Million Dollars ($1,000,000.00) were overlooked in the acquisition of the corporations, their recapture by the employer, particularly in light of the Stark and Frahm distribution provisions, would constitute an unwarranted and unintended windfall to the Defendant, the corporations' sole shareholder, who neither made any contribution to the assets which have accumulated nor forth-rightly bargained for them.

D. *Remedies*

33. Since the Court concludes that Defendant's failure to respond to written requests for information was malicious, and without justification, the Court holds Defendant liable for statutory damages in

the amount of One Hundred Dollars ($100.00) per day from April 13, 1984 until the date of trial. 29 U.S.C. § 1132(c).

■ 34. Bearing in mind the admonition of the concurring Justices in *Massachusetts Mutual Life Ins. Co. v. Russell*, —— U.S. ——, 105 S.Ct. 3085, 3099, 87 L.Ed.2d 96 (1985),[4] in accordance with the underlying statutory purposes of ERISA, this Court deems it appropriate for Defendant to repay to the W.P. pension plan all fees paid to himself after July of 1982. Although an agent is generally entitled to reasonable compensation for services, Defendant's obvious conflict of interest subsequent to his acquisition of the corporations and during the pendency of the present lawsuit rendered it wholly impossible for him to perform impartial service on the behalf of plan beneficiaries. Instead, Defendant's performance has been characterized by malice and by intentional disregard of his fiduciary duty. The unnatural prolongation of the life of the pension plan appears to have been motivated solely by Defendant's self-interest. Under the circumstances, the payment to himself of exorbitant fees, particularly when the plan has been charged for time spent by the Defendant in undoing the results of his own prior malfeasance and negligence, conflicts with Defendant's statutory duties. Defendant is further ordered to pay to the plan those payments on lakefront lots for which he is in default. *See* 29 U.S.C. §§ 1109(a), 1132.

■ 35. Reasonable attorneys' fees in the sum of Two Hundred Forty Thousand Dollars ($240,000.00) are jointly and severally assessed against Defendant, individually, who has acted in bad faith and in intentional disregard of his fiduciary obligations to Plaintiffs, and against the W.P. pension plan, in accordance with the principles established by the Fifth Circuit. *See, e.g., Donovan v. Cunningham*, 716 F.2d 1455, 1475 (5th Cir.1983); *Ironworkers Local No. 272 v. Bowen*, 624 F.2d 1255 (5th Cir.

1980). *See also Free v. Gilbert-Hodgman, Inc.*, No. 80–C–4492, slip op. (D.Ill. March 5, 1985) (president of employer corporation and trustee held jointly and severally liable for attorneys' fees and costs); *Donovan v. Schmoutey*, 592 F.Supp. 1361, 1406 (D.Nev.1984) (award of costs and fees jointly and severally against defendants who participated in breach of duty by trustee); *Teamsters Pension Trust Fund v. Philadelphia Fruit Exchange*, 603 F.Supp. 877, 881 (E.D.Pa.1985) (pension fund, corporation and employer individually held jointly and severally liable for costs and attorneys' fees).

■ 36. A trustee must serve solely in the best interest of a plan's participants. Since Defendant's conflicts of interest have impaired his ability to serve as a trustee, *see Donovan v. Bierwirth*, 680 F.2d 263 (2d Cir.1982), this Court concludes that he should be removed, and a substitute trustee shall be appointed. *See Marshall v. Snyder*, 572 F.2d 894, 901 (2d Cir.1978).

37. Plaintiffs shall submit to the Court within twenty (20) days a list of three (3) proposed substitute trustees. From this list, the Court will appoint a substitute trustee and plan administrator who shall call a meeting of the members pursuant to § 13.6 of the Stark and Frahm plan, for the purpose of selecting a controlling committee to terminate the plan.

38. The controlling committee together with the substitute trustee shall proceed to terminate the plan in accordance with PBGC requirements and in accordance with the distribution provisions of the Stark and Frahm plan. Since termination at this time of the Stark and Frahm plan may present tax disadvantages to the Plaintiffs, the controlling committee may, upon advice of the substitute trustee, elect to proceed with termination of the Hutcheson and Grundy plan which must be reformed in accordance with these Findings and Conclusions to con-

---

**4.** The four concurring Justices in *Russell* instructed courts in fashioning equitable relief to bear in mind the "ultimate consideration whether allowance or disallowance of particular relief would best effectuate the underlying purposes of ERISA—enforcement of strict fiduciary standards of care in the administration of all aspects of pension plans and promotion of the best interests of participants and beneficiaries." 105 S.Ct. at 3099.

tain Sections 13.3 and 13.6 of the Stark and Frahm plan.

39. In the event that the above Findings of Fact also constitute Conclusions of Law, they are adopted as such. In the event that the foregoing Conclusions of Law also constitute Findings of Fact, they are adopted as such.

## IV. *Conclusion*

In accordance with law and equity, this Court concludes that the relevant provisions of the Stark and Frahm plan, as originally presented for IRS consideration, must control the final disposition of assets which have accumulated in the W.P. pension plan. In light of Defendant's intentional and continuous breach of his duties as an ERISA fiduciary, this Court further concludes that a substitute trustee must be appointed to terminate the plan. Moreover, Defendant is to be held personally liable for the damages proximately caused by his misfeasance and deliberate violations of ERISA standards. This Court will retain continuing jurisdiction over this cause of action until assets have been distributed to the beneficiaries and participants of the plan. Accordingly, counsel for Plaintiff is directed to file a report with this Court every ninety (90) days until further notice.